**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE** | ) | |
| **CORPORATION AS RECEIVER FOR** | ) | |
| **MIDWEST BANK AND TRUST** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **JAMES J. GIANCOLA; JEROME JAY** | ) | **Case No. _____** |
| **FRITZ a/k/a J.J. FRITZ; ANGELO A.** | ) | |
| **DIPAOLO; BARRY I. FORRESTER;** | ) | |
| **ROBERT J. GENETSKI; GERALD F.** | ) | |
| **HARTLEY; HOMER J. LIVINGSTON,** | ) | |
| **JR.; JOSEPH R. RIZZA; EGIDIO V.** | ) | **JURY DEMANDED** |
| **SILVERI a/k/a E.V. SILVERI; LEON** | ) | |
| **WOLIN; THOMAS A. CARAVELLO;** | ) | |
| **SHELDON BERNSTEIN; THOMAS H.** | ) | |
| **HACKETT; MARY M. HENTHORN;** | ) | |
| **KELLY J. O'KEEFFE; BROGAN M.** | ) | |
| **PTACIN; JOHN S. SPEAR; and** | ) | |
| **WILLIAM H. STOLL,** | ) | |

      **Defendants**.

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Midwest Bank and

Trust Company ("FDIC-R"), for its Complaint, states as follows:

## I.

## INTRODUCTION

1.      The FDIC-R brings this lawsuit in its capacity as Receiver for Midwest Bank and

Trust Company, Elmwood Park, Illinois ("Midwest" or the "Bank"). Pursuant to 12 U.S.C.

§1821, the FDIC-R succeeds to all the rights, titles, powers, and privileges of the Bank and its

depositors, accountholders, other creditors, and stockholders, and seeks to recover over
$128 million in damages caused by Defendants' tortious conduct.

2.      The FDIC-R seeks recovery of tort damages caused by the Defendants' gross
negligence, negligence, and breaches of fiduciary duties in violating the Bank's policies and
prudent, safe, and sound banking practices.  In this lawsuit, the FDIC-R does not seek to collect
upon outstanding loans, but rather seeks to collect damages flowing from the Defendants' gross
negligence, negligence, and breaches of fiduciary duties.

3.      The facts alleged herein show that the Defendants exhibited an extreme departure
from the standard of care and want of even scant care by agreeing to lend $100 million to six
uncreditworthy borrowers and affiliated parties (collectively, the "loan transactions") without
adequately analyzing the creditworthiness of the borrowers and guarantors, without establishing
that the borrowers' proposed real estate projects were feasible or likely to result in repayment of
the Bank's funds, and without identifying any reasonably reliable and adequate source of
repayment.  This irresponsible conduct took place after the Federal Reserve Bank of Chicago
("FRB") and the Illinois Department of Financial and Professional Regulation ("IDFPR") had
extensively criticized Defendants' lending policies and practices, warned them expressly that
their lending practices would lead to losses, and taken specific enforcement action in an effort to
put the Bank on a safe and sound footing.  While Defendants responded to the enforcement
action by creating a new set of written loan policies designed to respond to the regulators'
criticisms and protect the Bank, their irresponsible practices never changed.  Defendants knew or
should have known that the Bank was unlikely to be repaid in the loan transactions, but their
gross disregard of the Bank's rewritten lending policies, as well as prudent lending practices,
caused damages of at least $62 million.

4.      The Director Defendants also disregarded prior experience, criticism, and the
Bank's specific policy when—after allowing more than $85 million of investments in certain
preferred stock—they failed to follow or enforce established policies and practices that required
securities to be sold if they became classified as "other-than-temporarily impaired" ("OTTI").
These policies and practices had been publically announced in 2005 following criticisms in the
form of a "material weakness" finding issued by Midwest's independent accountants relating to
significant earlier losses on the same type of securities—a situation that Defendant Giancola
described publically as an "embarrassment" and internally as a "fiasco."  Despite this prior
experience and promise of reform, in 2008, the Director Defendants again exhibited an extreme
departure from the standard of care and want of even scant care by ignoring the policies and
practices designed to protect the Bank from the risk of holding OTTI stock.  Instead of following
the Bank's specific policy requiring them to divest Midwest's investment portfolio of securities
that had become classified as OTTI—a simple, rational policy designed to protect the Bank—the
Director Defendants pursued an uninformed gamble and held the stock until it had lost most of
its value.  This caused damages of at least $66 million that would have been entirely avoidable
had they simply followed their publicly announced policies and practices.

5.      On May 14, 2010, the IDFPR closed Midwest and appointed the FDIC-R as
receiver pursuant to 12 U.S.C. § 1821(c).

## II.

## THE PARTIES

### A.      Plaintiff

6.      The FDIC is a corporation organized and existing under the laws of the United
States of America, specifically 12 U.S.C. § 1811 *et seq.*, and is an instrumentality of the United

States of America charged with, among other duties, the orderly liquidation of failed banks. 12

U.S.C. § 1821(d). Pursuant to 12 U.S.C. § 1821(c) and § 1821(d)(2)(A)(i), the FDIC-R

succeeds to the rights, titles, powers, and privileges of the Bank and its depositors,

accountholders, other creditors, and stockholders.

**B.** **Defendants**

**Director Defendants**

7. Defendant James J. Giancola ("Giancola") was Chief Executive Officer ("CEO")

and a member of the Bank's Senior Loan Committee ("SLC") from October 2004 until he was

terminated by the Bank's Board of Directors in January 2009. Giancola was a member of

Midwest's Board of Directors, a member of the Board's Asset-Liability Management Committee

("ALCO"), which directed Midwest's investment activities, and a member of the Board of

Directors of Midwest Banc Holdings, Inc. ("MBHI" or the "Holding Company"), Midwest's

holding company. He presently resides in Incline Village, Nevada. During all relevant times,

Giancola resided in River Forest, Illinois.

8. Defendant Jerome Jay Fritz a/k/a J.J. Fritz ("Fritz") was Chief Operating Officer

("COO") from July 2006 to January 2009, acting CEO from January to May 2009, and a member

of the SLC. He was a member of Midwest's Board of Directors and member of the Board's

ALCO from July 2006 to May 2009, and a member of the Board of MBHI. Fritz resides in

Inverness, Illinois.

9. Defendant Angelo A. DiPaolo ("DiPaolo") was a member of Midwest's Board of

Directors from May 2003 to July 2009, and a member of the Board of MBHI. DiPaolo resides in

Glenview, Illinois.

10.     Defendant Barry I. Forrester ("Forrester") was a member of Midwest's Board of Directors and the Board's ALCO from May 2005 until the Bank's closing, and a member of the Board of MBHI.  Forrester resides in Hinsdale, Illinois.

11.     Defendant Robert J. Genetski ("Genetski") was a member of Midwest's Board of Directors and Chairman of the Board's ALCO from February 2004 until the Bank's closing, and a member of the Board of MBHI.  Genetski resides in Chicago, Illinois.

12.     Defendant Gerald F. Hartley ("Hartley") was a member of Midwest's Board of Directors and Chairman of the Board's Audit Committee from June 2003 until the Bank's closing, and a member of the Board of MBHI.  He presently resides in Naples, Florida.  During all relevant times, Hartley resided in Leesburg, Indiana.

13.     Defendant Homer J. Livingston, Jr. ("Livingston") was a member of Midwest's Board of Directors and an ALCO member from May 2005 until December 2008, Chairman of Midwest's Board of Directors from January until December 31, 2008, and a member of the Board of MBHI.  Livingston resides in Northbrook, Illinois.

14.     Defendant Joseph R. Rizza ("Rizza") was a member of Midwest's Board of Directors from May 2003 until July 2009, and a member of the Board of MBHI.  Rizza resides in Oak Brook, Illinois.

15.     Defendant Egidio V. Silveri a/k/a E.V. Silveri ("Silveri") was a member of Midwest's Board of Directors from 1983 until the Bank's closing, a member of the Board's ALCO, Chairman of the Board from 1983 until January 2008, and a member of the Board of MBHI.  Silveri resides in River Forest, Illinois.

16.     Defendant Leon Wolin ("Wolin") was a member of Midwest's Board of Directors and a member of the Audit Committee from May 2003 until April 2008, and a member of the Board of MBHI.  Wolin resides in Chicago, Illinois.

### Officer Defendants

17.     Defendant Thomas A. Caravello ("Caravello") was the Chief Credit Officer ("CCO") and Chairman of the SLC from January 2005 until the Bank's closing.  Caravello resides in Mount Prospect, Illinois.

18.     Defendant Sheldon Bernstein ("Bernstein") was an Executive Vice President ("EVP") and a member of the SLC from January 2005 until November 2009.  Bernstein resides in Harwood Heights, Illinois.

19.     Defendant Thomas H. Hackett ("Hackett") was an EVP, head of Commercial & Industrial ("C&I") Lending and Credit Administration, and a member of the SLC from January 2005 until June 2009.  Hackett resides in Woodridge, Illinois.

20.     Defendant Mary M. Henthorn ("Henthorn") was an EVP, head of the Commercial Real Estate ("CRE") Lending Division, and a member of the SLC from January 2005 until April 2009.  Henthorn resides in Clarendon Hills, Illinois.

21.     Defendant Kelly J. O'Keeffe ("O'Keeffe") was an EVP and a member of the SLC from July 2006 until August 2009.  Prior to his tenure with Midwest, O'Keeffe was employed by Royal American Bank ("Royal American").  O'Keeffe resides in Arlington Heights, Illinois.

22.     Defendant Brogan M. Ptacin ("Ptacin") was an EVP, head of Corporate Lending, and a member of the SLC from July 2006 until August 2009.  Prior to his tenure with Midwest, Ptacin was employed by Royal American.  Ptacin resides in Arlington Heights, Illinois.

23.     Defendant John S. Spear ("Spear") was a Senior Vice President, a Senior Lender in the CRE Division, and member of the SLC from January 2005 until June 2006.  Spear resides in Darien, Illinois.

24.     Defendant William H. Stoll ("Stoll") was an EVP, head of Commercial Construction Lending and Special Assets, and a member of the SLC from January 2005 until April 2009.  Stoll resides in Crown Point, Indiana.

### III.

### JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

26.     The Court has personal jurisdiction over Defendants pursuant to 735 ILCS § 5/2-209, *et seq.* because, among other things, the FDIC-R's claims arise from the Defendants transacting business, committing tortious acts, and breaching fiduciary duties in Illinois.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the FDIC-R's claims occurred in this judicial district.

### IV.

### FACTUAL BACKGROUND

**A.      Background**

28.     Midwest was a state member bank regulated by the FRB and IDFPR.  The Bank's deposits were insured by the FDIC.

29.     Midwest's original charter dates to 1959.  Since 1983, it was a wholly owned subsidiary of MBHI.  The Bank's principal place of business was Elmwood Park, Illinois.

30.     Between 2001 and 2003, Midwest more than doubled its size from $755 million in assets to more than $1.9 billion in assets, and its business plan called for continued rapid growth.

31.     In 2003, a Report of Examination ("RoE") of Midwest issued jointly by the FRB and IDFPR specifically warned that "[f]undamental credit administrative processes are not in place or are inadequate for the size and risk profile of the organization."  The 2003 RoE indentified serious deficiencies in fundamental credit risk management practices making Midwest vulnerable to any "slowdown of the economy."  These deficiencies included weak financial analysis of borrowers' ability to repay the loans and guarantor strength, weak loan structuring, inadequate loan covenants, weak credit administration, and other shortcomings.  The RoE also warned that the type of loans in which Midwest was concentrated—CRE loans—"are vulnerable to wide risks including cost overruns, slow absorption, and final sell out at less than original appraised value."  Overall, the RoE concluded that a "well-designed and effective risk management function needs to be established now, prior to any growth initiatives."

32.     As a result of the deficiencies indentified in the 2003 RoE, the FRB and IDFPR took formal enforcement action against Midwest in the form of a March 15, 2004 Written Agreement (the "Written Agreement").  The Written Agreement required the Board of Directors to develop a management plan, to hire independent consultants to reevaluate the performance of Midwest's directors and senior management, and to adopt new lending policies and procedures.

33.     In response, the Board of Directors developed a new management plan which set four objectives: 1) diversify the loan portfolio with lower concentrations of CRE lending; 2) diversify funding sources; 3) raise the Bank's capital; and 4) achieve double-digit loan growth.

Ultimately, only the growth objective was achieved. By the end of 2007, Midwest had nearly doubled its size again, growing to approximately $3.7 billion in assets.

34.     In response to the reevaluation of management's performance, the Board of Directors reorganized the loan decision-making structure for Midwest, creating a Chief Credit Officer ("CCO") and a Senior Loan Committee ("SLC"). At all relevant times, Defendant Caravello was the CCO. The SLC was chaired by the CCO, and also included the CEO, Defendant Giancola, the heads of four loan divisions (all EVPs), Defendants Bernstein, Hackett, Henthorn, and Stoll, plus selected high ranking officers, including Defendant Spear, and later included—as a result of a 2006 merger with Royal American—Defendants Fritz, O'Keeffe, and Ptacin.

35.     Also, in response to the Written Agreement, the Board of Directors adopted a new commercial loan policy, which was then periodically reviewed, and with minor revisions, reapproved by the Board of Directors (the "Loan Policy"). The Board of Directors described the new Loan Policy to the FRB and IDFPR as "establishing guidelines for lender and lending practices" and as establishing "stated underwriting standards for specific types of credit."

36.     The Loan Policy contained the following specific requirements:

a.   The borrower's ability to repay the loan through cash flow was required to be demonstrated by an objective analysis of financial information.

b.   Loans to any one borrower, including affiliates, ("LTOB") were to be limited to a ceiling set by Midwest's Board of Directors.

c.   Loans to closely-held entities were to be guaranteed by principals of those entities.

d.  Loan to value ("LTV") ratio limits were set for specific types of loans, limiting the amount the Bank could lend to a specific percentage of the value of the collateral.

e.  Current appraisals were to be obtained prior to funding for loans secured by real estate by approved appraisers complying with appraisal standards.

f.  Feasibility studies were to be obtained for real estate development or construction loans, such as condominium developments.

g.  Loans were to be structured such that the purpose of each credit extension was clearly documented, demonstrating economic benefit from use of the funds, and that the borrower could repay the loan through cash flow in accordance with the purpose of the loan.

h.  Unsecured loans could be made only to customers of sound net worth, above average liquidity and unquestionable repayment ability.

i.  Lines of credit were to be granted for no more than a twelve month period, and were to be liquidated at least once during the year in order to be renewed.

j.  Loans secured by risky assets, such as mobile home parks, were to be secured by additional sources of repayment.

k.  Out-of-area loans required stronger borrowers and security.

l.  Participation loans were to be underwritten in the same manner as loans extended solely by Midwest.

m.  Financial statements for a minimum of the preceding two years were to be obtained and reviewed.

n.  Collateral was to be properly documented to perfect security interests.

    o.   Accounts receivable used as collateral were to be current.

    p.   Contract receivables and delinquent accounts were not to be used as collateral.

    q.   All extensions of credit to directors, executive officers, and insiders were to be made on terms substantially the same as those offered to other borrowers and approved by the Board of Directors.

    r.   Capitalization of interest was generally forbidden and was only allowed in the rarest of exceptions.

    s.   Refinancing of a loan to postpone loss recognition was prohibited.

    t.   Commercial loans 90 days delinquent were to be placed on nonaccrual status automatically.

37.    Notwithstanding the formal changes adopted in response to the Written Agreement, the Defendants disregarded the directives of the new Loan Policy and continued to approve high-risk loans to uncreditworthy borrowers without establishing the borrowers' ability to repay based on an objective analysis of cash flow and debt.  As detailed below, between late 2005 and early 2008, Defendants approved a number of large and grossly imprudent loans, which, combined with Director Defendants' gamble on declining investment securities, caused damages in excess of $128 million.

## B.    Defendants' Tortious Conduct in Connection with Borrowers A Through F

38.    In connection with the lending function of the Bank, as described below, Defendants routinely failed to identify reasonably reliable and adequate sources of repayment from the borrowers.  In addition, Defendants routinely ignored and repeatedly failed to enforce material Loan Policy requirements and frequently departed from fundamental safe and sound banking practices.  Many of Defendants' approval decisions were made as the real estate market

continued its precipitous decline.  The frequency and magnitude of the departures from the standard of care constitute gross negligence.

39.     Defendants' approvals of the loan transactions reveal a pattern of gross negligence, which caused enormous losses, because, *inter alia*:

a.  Defendants extended credit to the borrowers without first identifying reasonably reliable and adequate sources of repayment.

b.  Defendants extended excessively large amounts of credit to the borrowers, violating the Loan Policy limiting the amount of loans that could be extended to one borrower and the Loan Policy's limits on the amount of credit that could be extended in relation to the value of the collateral obtained from the borrower.

c.  Defendants extended these excessive amounts of credit to borrowers already evidencing financial weakness.  The borrowers described below showed distinctive signs of financial weakness and credit risk.  Business was declining, projects were not being completed on schedule, most borrowers already had excessive debt (both to Midwest and other lenders), and some were literally on the brink of failure when Defendants extended more credit.

d.  Defendants structured the loans on terms excessively favorable to the borrowers, failing to impose requirements on the uses of the funds that would ensure they were put to authorized and productive uses that would generate cash flow for the repayment of the loan.  Instead, Defendants approved loans that were loosely structured as general lines of credit for "working capital," allowing the funds to be used for purposes inappropriate to a working capital

loan, such as for long-term real estate investments, capitalization of interest, and paying the borrower's other debts. Moreover, Defendants improperly approved loans that were wholly unsecured and, on the construction loans, Defendants routinely waived feasibility studies required by the Loan Policy for such loans, and ignored inspectors' warnings of excessive draws relative to construction progress.

e. Defendants approved loans despite multiple collateral deficiencies. Defendants frequently approved loans without first obtaining appraisal reports and financial information and, when appraisals arrived— often after the loan had been approved based on an assumption of value— Defendants took no action even when the appraisals showed the collateral to be less than the amount required for the approval and/or accepted appraisal valuations that were not based on market values. Defendants also relied on forms of collateral that could not be reasonably liquidated, such as assignments of partnership interests and contract receivables, and routinely failed to require borrowers to put their own financial assets at risk through enforceable personal guaranties or through the contribution of real equity to their projects.

f. Defendants routinely extended maturities and increased the loan amounts when the borrowers were unable to pay. These extensions served only to compound the losses by delaying recognition of the problems and increasing the amounts loaned to the borrowers.

## Borrowers A-1 and A-2[1]

40.     As of July of 2005, Midwest's outstanding lending to Borrower A-1, a large

Chicago-area construction company, and to the company's principal, Borrower A-2, exceeded

$25 million.  In addition to exceeding the Loan Policy limit for loans to one borrower, these

loans were already under-secured and the borrowers' financials demonstrated that Borrowers A-

1 and A-2 were unable to repay the existing debt.

41.     Borrower A-1's revenues had declined over the previous three years.  Its net

income had declined by an alarming 60% between year-end 2003 to year-end 2004, the Bank had

no current financial information for the first half of 2005, and nearly all of Borrower A-1's cash

was devoted to debt service.  Borrower A-2, in July of 2005, had a negative debt coverage ratio,

negative income, and unpaid tax liability of more than double his income in 2003.  Moreover, the

security for these loans consisted primarily of the borrowers' contract receivables which the

Loan Policy declared "not eligible" collateral.  In fact, two-thirds of the "receivables" were

litigation claims against the City of Chicago that had been pending for nearly six years.

42.     Nevertheless, starting in July of 2005, Defendants approved a series of new loans

to Borrowers A-1 and A-2, as described below.  Over the next year, Defendants' approval of new

extensions of credit added approximately $18.4 million in amounts loaned to these borrowers

and their affiliates and resulted in damages of at least $14.6 million to the FDIC-R.

## New $5.0 million unsecured loan to Borrower A-2

43.     On July 26, 2005, Defendants Caravello, Bernstein, Hackett, Spear, Stoll,

DiPaolo, Silveri, and Wolin, acting through the Executive Loan Committee ("ELC"), approved,

on a completely unsecured basis, an additional $5 million line of credit to Borrower A-2.  The

---

[1] The names of the borrowers and guarantors are not included herein to avoid unnecessary
disclosure of personally identifiable information.

purpose of the loan was to provide funds to Borrower A-2 with which he would make "capital infusions" into his company, Borrower A-1 (the "Borrower A-2 $5 Million unsecured Loan").

44.     The Defendants approving the Borrower A-2 $5 Million unsecured Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

a.  Defendants failed to identify any reasonably reliable and adequate source of repayment for this loan. The Commercial Credit Approval Memorandum ("CCAM") showed that Borrower A-2 had negative income. The loan provided no recourse against Borrower A-1, the purported beneficiary of the loan. But even if it had, the earnings of Borrower A-1 were declining and were insufficient to cover its existing debt obligations.

b.  Defendants' approval of an unsecured loan violated the Loan Policy which provided that unsecured loans must be made only to customers of sound net worth, above average liquidity and "unquestionable" repayment ability. Borrower A-2 had a negative debt coverage ratio, negative income, unpaid tax liability, and had already fully drawn a $10 million line of credit before seeking this additional $5 million unsecured line of credit.

c.  This loan placed the Borrowers A-1 and A-2 relationship even further outside of the Loan Policy's loans to one borrower limit, increasing the amounts loaned to over $30 million.

d.  The stated purpose of the loan was to fund additional "capital infusions" by Borrower A-2 into Borrower A-1. Defendants assumed that Borrower A-1 would pay the interest on this loan and noted that the increased interest

- 15 -

obligation would cause its debt service coverage ratio to fall below the Loan Policy's minimum level of 1.1.

e.   Defendants required no current personal financial statement or tax returns to support the loan.

f.   Defendants imposed no conditions limiting the use of the money that would ensure that the funds would be put to any productive use.

g.   Defendants' approval of this loan violated the Loan Policy's prohibition on capitalization of interest by funding the borrower's interest payments on other loans to the Bank.

45.   As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Bernstein, Hackett, Spear, Stoll, DiPaolo, Silveri, and Wolin with respect to the Borrower A-2 $5 Million unsecured Loan, the FDIC-R incurred damages in excess of $5 million.

**New $5.0 million unsecured loan to Borrower A-1**

46.   Less than a month later, on August 23, 2005, Defendants Caravello, Giancola, Bernstein, Hackett, Henthorn, Spear, Stoll, DiPaolo, Forrester, Livingston, Silveri, and Wolin, acting through the ELC, approved yet another unsecured $5.0 million loan, this time to Borrower A-1 for the purpose of funding Standby Letters of Credit that the borrower was being required to post to guaranty its performance on construction contracts it was trying to complete (the "Borrower A-1 $5 Million unsecured Loan").

47.   The Defendants approving the Borrower A-1 $5 Million unsecured Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

- 16 -

    a.   Defendants failed to identify any reasonably reliable and adequate sources of repayment for this loan.  At the time of the approval, Borrower A-1's net income was less than half of its total debt service for the preceding year and the loan's guarantor, Borrower A-2, had negative income.

    b.   The structure of the loan approved by Defendants—financing letters of credit—compounded the risks since, if Borrower A-1 could not perform on its construction contracts, Midwest would both lose the chance to be paid by Borrower A-1 from its contract receivable associated with the project and be on the hook to pay to remedy Borrower A-1's nonperformance by funding the letter of credit.

    c.   Defendants' approval of this loan placed the Borrowers A-1 and A-2 relationship even further outside of the Loan Policy's loans to one borrower limit.

    d.   Defendants' approval of an unsecured loan violated the Loan Policy which provided that unsecured loans must be made only to customers of sound net worth, above average liquidity and "unquestionable" repayment ability.

    e.   Defendants required no current personal financial statement or tax returns to support the loan despite clear signs that the borrower's business was declining.

48.    As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Giancola, Bernstein, Hackett, Henthorn, Spear, Stoll, DiPaolo, Forrester, Livingston, Silveri, and Wolin with respect to the Borrower A-1 $5 Million unsecured Loan, the FDIC-R incurred damages of approximately $3 million.

**New $3.0 million under-secured loan to Borrower A-1**

49.     By March 2006, the Borrower A-related accounts at Midwest were chronically overdrawn and the borrowers could not meet interest payments.  On March 16, 2006, Defendants Caravello, Henthorn, Spear, and Stoll, as members of the SLC, approved another loan to Borrower A-1 in the amount of $3 million to cover "short-term" cash flow difficulties (the "Borrower A-1 $3 Million under-secured Loan").

50.     The Defendants approving the Borrower A-1 $3 Million under-secured Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

     a.  Defendants failed to identify reasonably reliable and adequate sources of repayment for this loan.  Borrower A-1 was known to be unable to repay its debts and Defendants identified no reasonable basis to conclude that Borrower A-1's business would turn around.

     b.  Defendants approved the loan despite that fact that it was under-secured. Midwest obtained a mortgage on an asset worth approximately half the amount loaned.

     c.  As recognized by Defendants at the SLC meeting, this loan raised the aggregate lending to Borrowers A-1 and A-2 to over $35 million, thereby placing the relationship even further outside of the Loan Policy's loans to one borrower limit.

     d.  Defendants' approval of this loan violated the Loan Policy's prohibition on capitalizing unpaid interest as it allowed the borrower to make payments temporarily to avoid default on its other loans.

51.     As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Henthorn, Spear, and Stoll with respect to the Borrower A-1 $3 Million under-secured Loan, the FDIC-R incurred damages in excess of $1.2 million.

**New $5.45 million Wind Down/Litigation Loans**

52.     In May 2006, only two months after approving the $3 million "short-term" cash flow loan, the SLC advised the Board of Directors that Borrowers A-1 and A-2 were again unable to make their loan payments.  In June 2006, Defendants Caravello, Bernstein, Henthorn, Stoll, Giancola, and Spear, with Board of Directors approval, hastily extended the maturities and consolidated the outstanding loans of the Borrower A relationship.

53.     Despite the ongoing issues with the outstanding loans to Borrowers A-1 and A-2 and no reasonable analysis indicating that loaning additional funds would result in any greater recovery, beginning in July 2006, Defendants approved an additional $5.45 million in loans to Borrower A-1 (collectively, the "Wind Down/Litigation Loans") as follows: (1) On July 25, 2006, Defendant Caravello recommended and the Board of Directors, including Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, approved an extra $2.75 million loan to fund the "wind-down" of the company; (2) On August 22, 2006, Defendant Caravello recommended and the Board of Directors, including Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Silveri, and Wolin, approved an additional $1.5 million to fund the company's ongoing litigation against the City of Chicago; and (3) On November 6, 2006, Defendants Caravello, Giancola, and O'Keeffe approved a $1.2 million increase of the wind-down loan.

54.     The Defendants approving the Wind Down/Litigation Loans engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by,

among other things, the following:

    a.  Defendants failed to identify reasonably reliable and adequate sources of repayment for this additional credit as there was no reasonable analysis indicating that loaning additional funds to Borrower A-1 would result in any greater recovery on the already-defaulted debt described above.  As even Defendant Fritz recognized, Defendants were approving the wind-down lending "for the chance at a trickle of cash" when the "borrower will declare [bankruptcy] right after the loan."

    b.  Defendants' approval of extensions made to delay recognition of the extent of losses in prior loans violated the Loan Policy's prohibition against capitalizing interest.

    c.  Despite the extension of additional credit, no new valuable collateral was obtained.

    d.  Defendants allowed the loans to be structured without adequate control over the use of the funds despite the fact that the Defendants had concluded that the borrower had diverted for personal use funds assigned to the Bank.

55.    The Wind Down/Litigation Loans only served to increase the total damages to the FDIC-R.  Indeed, as Defendant Fritz predicted, when the funding from the Wind Down/Litigation Loans was exhausted, Borrower A-1 filed bankruptcy in July 2007.

56.    As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Giancola, Fritz, Caravello, O'Keeffe, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, with respect to the Wind Down/Litigation Loans, the FDIC-R incurred damages in excess of $5.45 million.

- 20 -

## Borrower B

57.     By February 2006, the Bank's total lending to Borrower B, its affiliates and their controlling principal, Mr. B, a Chicago real estate developer and builder, (collectively, Borrower B) was $22.9 million.  The outstanding loans were for two behind-schedule condominium projects in Chicago's West Loop area.  Nevertheless, from February 2006 through February 2008, Defendants increased the amounts loaned to Borrower B by lending an additional $27.5 million on the two projects described below—the Jackson Project and the Sangamon Project— which resulted in damages to the FDIC-R exceeding $21 million.

## The Jackson Project

58.     The Jackson Project involved loans to Borrower B to gut an old warehouse, add two stories, and convert it into 70 condominium units.  The project was supposed to require $11 million in construction financing and have been completed by August 2006.  But by February 2007 the project was barely two-thirds complete and feasibility issues central to the marketability and valuation of the project, including a critical parking issue, remained unresolved.  Moreover, inspectors were regularly warning that the borrower was drawing excessive funds for soft costs and that construction progress was not keeping pace with loan disbursements.  Indeed, an appraisal obtained at the end of 2006 showed that the Bank had already loaned over $3.0 million more than the property would be worth assuming the parking and other feasibility issues could be resolved.

### The $7.5 Million Jackson Cost Overrun Loans

59.     Nevertheless, beginning in 2007, Defendants began approving additional lending to the failing project which, by February 2008, totaled $7.5 million (the "Jackson Cost Overrun Loans") as follows: (1) On February 1, 2007, Defendants Caravello, Fritz, Bernstein, Hackett,

Henthorn, O'Keeffe, and Stoll, as members of the SLC, approved an $800,000 increase to the construction loan; (2) On May 2, 2007, Defendants Caravello, Giancola, Fritz, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, and Stoll, as members of the SLC, again approved an increase to the construction loan in the amount of $200,000; (3) On July 25, 2007, Defendants Caravello, Giancola, Fritz, Bernstein, Hackett, Henthorn, O'Keeffe, and Ptacin, as members of the SLC, increased the construction loan by another $3.1 million; and (4) On February 15, 2008, Defendants Caravello, Ptacin, O'Keeffe, and Stoll, as members of the SLC, approved a new supplemental line of credit for an additional $3.4 million.

60.    The Defendants approving the Jackson Cost Overrun Loans engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

a.    Defendants failed to indentify reasonably reliable and adequate sources of repayment for these loans. The feasibility of the Jackson Project remained unresolved and sales of condominium units had ceased.

b.    Defendants approved the loans even though they were already under-secured and the additional lending was not shown to lead to an increase in the value of the property.

c.    Defendants approved the loans despite the fact that the developer/borrower had already demonstrated unreliability with respect to the use of the Bank's loan funds and an inability to complete its projects at the time the loans were approved.

d.    Defendants approved the July 25, 2007 and February 15, 2008 loans without first obtaining an appraisal despite obvious deteriorations in the market and

the failure of the construction on the property to advance commensurate with loan disbursements.

e. Defendants' approval of these loans served only to delay recognition of the problem with underlying credit, in violation of the Loan Policy.

f. Contrary to the Loan Policy against capitalization of interest, these increases approved by Defendants kept the loans current.

61. The Jackson Cost Overrun Loans did nothing to improve Midwest's position. The additional $7.5 million in increased lending was essentially unsecured since the loans were based on the same collateral already insufficient to secure the original funding and resulted in total charge offs. The loans went into default with the project still unfinished in 2009, and with the parking issue never being resolved. And the projected value upon completion was barely 20% of the total funds loaned on the project.

62. As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Giancola, Fritz, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin and Stoll with respect to the Jackson Cost Overrun Loans, the FDIC-R incurred damages in excess of $7.5 million.

## The Sangamon Project

63. The Sangamon Project involved acquisition and construction lending for a project to convert three parcels into a 45-unit condominium building, a 65-unit condominium building with 119 parking spaces, and a mixed-use property combining retail plus four townhouses and additional parking. Similar to the Jackson Project, the loans were approved without detailed plans showing design feasibility, a substantiated budget, a realistic schedule for specific completion of development tasks, or sufficient collateral.

64.    As detailed below, Defendants approved $19.9 million in funding to Borrower B for this project.  This included $7.3 million for acquisition financing plus $11.6 million for construction financing, consisting of $7.8 million in initial funding and $3.8 million in supplemental funding (the "Sangamon Acquisition and Construction Loans").  Additionally, Defendants approved a $1 million loan to an entity acting as a mezzanine financer of the Sangamon Project (the "Sangamon Mezzanine Loan").  This additional $19.9 million in financing for the Sangamon Project resulted in at least $13.8 million in damages.

**Sangamon Acquisition and Construction Loans**

65.    On February 9, 2006, Defendants Caravello, Bernstein, Hackett, Henthorn, and Spear, as members of the SLC, approved a $7.3 million line of credit to Borrower B to finance the acquisition of three parcels.  A month later, on March 9, 2006, Defendants Caravello, Bernstein, Hackett, Henthorn, Spear, and Stoll, as members of the SLC, approved a construction loan advancing $7.8 million.  Thereafter, Defendants approved an additional $3.8 million in supplemental funding as follows: (1) On December 21, 2006, Defendants Caravello, Fritz, Bernstein, Hackett, Henthorn, O'Keeffe, and Stoll, as members of the SLC, approved a $1.0 million increase; (2) On September 19, 2007, Defendants Caravello, Giancola, Fritz, Hackett, Henthorn, O'Keeffe, Ptacin, and Stoll, as members of the SLC, approved a $0.7 million extension and increase; and (3) On November 7, 2007, Defendants Giancola, Fritz, Hackett, Henthorn, O'Keeffe, Ptacin, and Stoll, as members of the SLC, approved another $2.1 million extension and increase.

66.    The Defendants approving the Sangamon Acquisition and Construction Loans engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

a. Defendants failed to identify reasonably reliable and adequate sources of
repayment for these loans.  Repayment of the loans depended upon the
success of the Sangamon Project, the feasibility of which was not established,
and the value of the real estate collateral was insufficient to repay the loans.
The guarantor had insufficient assets to repay the loans.

b. Defendants approved these loans despite the fact that they did not comply
with the Loan Policy's LTV requirements.  Defendants approved the
acquisition loan before obtaining a current appraisal on the collateral, contrary
to the Loan Policy, on the assumption that the property value would comply
with the Loan's Policy's requirement that the LTV ratio not exceed 75% of
the "appraised 'as is' value."  But the appraisal, received approximately a
week after the acquisition funding was approved, showed an "as is" value of
the underlying property of only $6.6 million, making the LTV over 110%.
The appraisal also disclosed that there was a significant market risk in that
existing projects in the West Loop—including projects from the same
borrower being financed by the Bank—were languishing on the market with
unsold inventory.

c. Defendants did not require a feasibility study, as required by the Loan Policy,
in approving these loans.  A feasibility study would have highlighted the
impediments to the project posed by zoning restrictions and market risks.
Moreover, the loans were approved without requiring submission and review
of a substantiated budget, detailed plans showing design feasibility, and a
realistic schedule for specific completion of development tasks.

    d.   Defendants' approval of these loans placed Borrower B in excess of the Loan Policy's lending limit to one borrower.

    e.   Defendants approved these loans without requiring any effective controls over disbursements to ensure that progress was commensurate with the portion of the loan funds being disbursed.

    f.   Before committing to the new Sangamon Project, Defendants had become aware of problems with earlier condominium project financing with Borrower B (including the Jackson Project) that put them on notice of the need to more carefully evaluate the proposed lending and to impose controls.

    g.   The loans required no real equity contribution from the borrower; instead, the Defendants permitted the equity contribution to come in the form of "mezzanine" financing also partly financed by Midwest (discussed *infra*).

67.    The Sangamon Project was supposed to have been completed by December 2006, but by July 2008 it was still only 80% complete. Borrower B had exhausted all of the loan funds, including the supplemental funding, abandoned the condominium plan, cancelled the purchasers' contracts, and left the building with the roof unfinished, leading to extensive mold damage.

68.    As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Giancola, Fritz, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, and Stoll, with respect to the Sangamon Acquisition and Construction Loans, the FDIC-R incurred damages in excess of $12.8 million.

**Sangamon Mezzanine Loan**

69.     On February 16, 2006, Defendants Caravello, Henthorn, Spear, and Stoll, as members of the SLC, approved a $1.0 million loan to a limited partnership, consisting of Mr. B and two other Midwest borrowers, to fund the Mezzanine Loan that was supposed to contribute equity to the Sangamon Project (the "Sangamon Mezzanine Loan").

70.     The Defendants approving the Sangamon Mezzanine Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

a.  Defendants failed to identify reasonably reliable and adequate sources of repayment for this loan.  As repayment of the Mezzanine Loan was entirely dependent on the success of the Sangamon Project, the loan was subject to the same defects as the Sangamon Project loans noted above.

b.  Defendants' approval of this loan facilitated a further violation of the LTV requirement for the Sangamon Project financing in that the mezzanine financing was improperly considered to be an equity contribution to the project even though the source of the funds was Midwest.

c.  The loan was secured only by what turned out to be an ineffective assignment of partnership interests that the entity making the loan had in the project.  The form of the collateral was not subject to ready liquidation and had no material value.

71.     As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Henthorn, Spear, and Stoll with respect to Sangamon Mezzanine Loan, the FDIC-R incurred damages in excess of $1 million.

## Borrower C

72.     Borrower C was a Subchapter-S corporation in which four siblings, believed to have substantial wealth, held the beneficial interests.  Borrower C engaged in real estate investing and development in the Chicago area with two other real estate developers through the use of numerous single-purpose limited liability entities (the "Borrower C Related Entities").  Borrower C had a one-third interest in each of those Borrower C Related Entities.

73.     On April 13, 2006, Defendants Caravello, Giancola, Hackett, Henthorn, Spear, and Stoll, as members of the SLC, as well as Fritz and Ptacin on behalf of Royal American, approved a fourteen-month $30 million line of credit to Borrower C for "working capital" and other nonspecific purposes (the "Borrower C Loan").  The loan originated as a participation loan between Royal American and Midwest, with Midwest's portion being $20 million and Royal American's portion being $10 million.  It was made with the understanding that the entire $30 million would soon "fall under one roof," upon the July 1, 2006 effective date of the merger between Midwest and Royal American.

74.     The Defendants approving the Borrower C Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

   a.   Defendants failed to identify reasonably reliable and adequate sources of repayment for this loan.  There was no restriction or control over the use of loaned funds to ensure that the funds would be used to generate sources of repayment.  The purpose of the line of credit was vaguely described as "working capital need, land acquisitions, soft project costs, and letters of

credit" without designation to specific projects. The amount of the loan was essentially equal to Borrower C's entire net worth.

b.   Contrary to the Loan Policy, Defendants failed to require personal guaranties, either from the four siblings or from the two partners of Borrower C, despite Borrower C being a closely-held corporation.

c.   Defendants failed to require adequate security for the loan. The $30 million line of credit was secured by real estate having a total appraised value of only $8.6 million plus an assignment of Borrower C's membership interests in the Borrower C Related Entities. The value of the assignment was limited since the membership interests could not be readily liquidated when necessary.

d.   Defendants approved this loan despite evidence of the borrower's financial weakness due to its inability to provide sufficient collateral to secure borrowings on its existing lines of credit to another financial institution.

e.   Defendants' approval of the loan resulted in a violation of the Bank's internal lending limit as the loan was approved knowing that, after the merger's effective date, the loan would exceed the loan to one borrower limit and would require a participant bank.

f.   Defendants compounded the risk by renewing the loan in July 2007 despite the fact that home prices had dropped precipitously and the CCAM submitted with the renewal request noted the building industry was "struggling," orders were down over 10% on a year over year basis in the Chicago homebuilding market, and Borrower C's own net sales were down over 20% from the previous year. Defendants approved the extension without first reviewing

current financial information from the borrower which would have disclosed that it was in breach of net worth and cash flow covenants. The renewal also permitted the continued violation of the Bank's internal lending limit as the loan was approved on the condition that Midwest find a participant bank to take $6 million, which did not occur because no other lender would participate due to the lack of hard collateral securing the loan.

g. Defendants extended this line of credit without requiring that it be liquidated at least once during the term in violation of the Loan Policy.

75. The loan was thereafter renewed on multiple occasions despite continuing decline in the borrower's financial strength, including foreclosures by other lenders on properties held by the Borrower C Related Entities, demonstrating one of the principal flaws in relying on assignment of the borrower's interest in partnerships, rather than taking security in assets financed by the loan. In May 2010, Borrower C filed bankruptcy.

76. As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Giancola, Fritz, Hackett, Henthorn, Ptacin, Spear, and Stoll, with respect to the Borrower C Loan, the FDIC-R incurred damages in excess of $9 million.

**Borrower D**

77. Borrower D was a corporation engaged in the home-building business. On June 6, 2006, Defendants Ptacin and Fritz, then with Royal American, and with the concurrence of Defendants Caravello and Stoll, approved a $5 million unsecured line of credit to Borrower D (the "Borrower D Loan"), backed only by a personal guaranty from the sole owner of the company, Mr. D. The purpose of the loan was to fund working capital needs, "specifically earnest money deposits on land acquisition contracts."

- 30 -

78.     The Defendants approving the Borrower D Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

   a.   Defendants failed to identify reasonably reliable and adequate sources of repayment for this loan.  There was no control or restriction over the use of the funds to ensure that the funds would be used to generate sources of repayment.  The approved purpose of the line of credit was for the liberal and general use of "working capital needs," without designation to specific projects, in violation of safe and sound lending practices.  Moreover, Borrower D had several other unsecured open lines of credit at other banks totaling approximately $13 million which, coupled with the line of credit from Midwest, were nearing Borrower D's net worth, contrary to fundamental safe and sound lending practices.  And the loan's structure enabled Borrower D to use the loaned funds to pay other lenders.

   b.   Defendants' approval of an unsecured loan was imprudent and in violation of the Loan Policy requirement that unsecured loans be only made to those customers with "unquestionable" repayment ability and above-average liquidity.  Borrower D's repayment ability was questioned at the time of the approval because Borrower D was known to be experiencing "turbulence" and had high inventory that was turning slowly.  Moreover, Borrower D's liquid assets had declined significantly over the preceding two years and the remaining assets were not highly liquid as they consisted of real estate projects.

c. Defendants approved this risky loan knowing of the real estate market weakness. During the approval process, Defendant Caravello noted to Defendant Ptacin, his "concern [that] this real estate bull market has lived long past its normal cyclical term." Defendant Fritz also commented on the market's "deflation" and stated that "[i]t would be great if we could have some kind of control on his lines or at least mitigate the risk in this down cycle."

d. Defendants failed to obtain an effective guaranty by failing to seek the joint guaranty of Mr. D's spouse despite the fact that the financial statement provided by Mr. D, the sole guarantor, revealed that his assets were actually jointly-held with his wife and in family trusts. Defendants' failure to obtain a guaranty from the guarantor's wife allowed the guarantor to be able to transfer assets to his wife to avoid collection.

e. Defendants O'Keeffe and Ptacin compounded the risk when, on May 22, 2007, they renewed the loan without SLC approval, in violation of the Loan Policy, and despite additional information reflecting a further increase in Borrower D's overall weaknesses, including: (1) a more than 50% decrease in sales from year-end 2005 to year-end 2006; (2) a significant increase in inventory from year end 2005 to third-quarter 2006; (3) a high leverage ratio of 7.1; (4) the "[c]urrent status of [the] housing market"; and (5) that collection activity was in process against Borrower D for monies owed to another borrower of Midwest. Moreover, when asked shortly before the renewal how the funds had been used, Borrower D acknowledged that the

company "ha[d] run negative cash flow since the beginning of 07" and that the funds were being used to cover expenses, with no mention of the funds being used to acquire land.

    f.    Defendants' approval of extensions of this line of credit violated the Loan Policy's requirement that the line of credit have been liquidated at least once during the term.

79.    By April 2008, the Borrower D Loan was in default and the borrower was experiencing trouble with its other lenders as well. As the loan was unsecured, the Bank was forced to look to Mr. D's personal guaranty which was inadequate because of the excessive obligations on loans to other banks and because of Defendants' failure to obtain the guaranty of Mr. D's spouse, with whom his assets were jointly held.

80.    As a result of the negligence, gross negligence, and breaches of fiduciary duties of Defendants Caravello, Fritz, O'Keeffe, Ptacin, and Stoll, with respect to the Borrower D Loan, the FDIC-R incurred damages in excess of $3.7 million.

**Borrower E**

81.    Borrower E is a special purpose limited liability company organized to acquire and develop 12 acres of vacant land in Joliet, Illinois. On September 14, 2006, Defendants Giancola, Fritz, Caravello, Hackett, Henthorn, O'Keeffe, and Stoll, as members of the SLC, approved a $4.79 million one-year construction line of credit to Borrower E (the "Borrower E Loan"). The purpose of the loan was to subdivide the land into multiple parcels and to develop a retail strip center on a portion of the land on a speculative basis.

82.    The Borrower E Loan was a loan to an insider because Defendant director Rizza was the principal owner of the closely-held borrowing entity. The loan was therefore subject to

the restrictions of Regulation O and required to be approved by the Board of Directors. The SLC presented the loan to the Board of Directors at a September 26, 2006 Board meeting. The Board of Directors, including Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Silveri, and Wolin, as well as Defendant Rizza, who remained present during the loan's discussion, allowed the loan to be funded without recording any votes on the loan at the Board level. On August 26, 2008, Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, and Silveri voted to approve a renewal of the loan because it had not been paid.

83.     The Defendants approving the Borrower E Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

a.     Defendants failed to identify reasonably reliable and adequate sources of repayment for this loan. The construction project was speculative, no feasibility study supporting the project was obtained, the collateral was inadequate to repay the loan, and the guarantors lacked sufficient liquid assets to support repayment of the loan.

b.     Defendants did not require that Defendant Rizza personally guarantee the loan contrary to the Loan Policy.

c.     The loan was structured to allow the borrower to sell off sections of the collateral without a corresponding decrease in the credit line, so that the value of the remaining collateral for the loan became insufficient to cover the debt.

d.     The construction loan was made despite the Defendants' recognition that the real estate market was "slowing," as specifically noted in the September 2006

CCAM, and that the borrower had no pre-leasing agreements for any of the proposed retail space the borrower planned to develop with the loaned funds.

e.  Contrary to the Loan Policy, Defendants approved the loan without first obtaining an appraisal of the property.

f.  The LTV ratio, based on a subsequently-received appraisal, was well above the allowed Loan Policy limit.

g.  Contrary to the Loan Policy, Defendants approved the loan without obtaining a feasibility study for the project and failed to require a detailed cost budget, building plans, and a construction schedule needed to appraise and evaluate the project.

h.  Regulation O, as well as the Loan Policy, required that the Bank not make any loan to an insider unless it was on the same terms as comparable non-insider loans, was in accordance with the Loan Policy, was approved by the Board, and did not present terms unfavorable to the Bank.  The loan was made on preferential terms, was unfavorable to the Bank, and violated both fundamental prudent lending practices and the Loan Policy.

i.  Contrary to the Loan Policy and Regulation O, the SLC failed to present the loan for a vote by the Board.

84.  The Borrower E Loan was repeatedly renewed and extended due to the borrower's inability to convert the strip center into cash to repay the loan due to the lack of a market for the project.  Because Defendants structured the loan as a revolving line of credit, Borrower E was able to sell other parcels of the collateral without reducing the overall outstanding credit causing the collateral to be inadequate to repay the debt following default.

85.     As a result of the negligence, gross negligence and breaches of fiduciary duty by Defendants Caravello, Fritz, Giancola, Hackett, Henthorn, O'Keeffe, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin with respect to the Borrower E Loan, the FDIC-R incurred damages in excess of $2.62 million.

**Borrower F**

86.     On May 14, 2008, Defendants Caravello, Fritz, Bernstein, Hackett, Henthorn, Ptacin, and Stoll, as members of the SLC, approved a $16 million two-year interest-only term loan to three related limited liability companies (collectively, Borrower F).  The purpose of the loan was to refinance an amortizing mortgage held by another lender on two distressed mobile home parks—one located in the greater Flint, Michigan area in Genesee County and the other located approximately 40 miles away in Saginaw County, Michigan (the "Borrower F Loan").

87.     Borrower F requested the loan of Defendant O'Keeffe who had an ownership interest in Borrower F's business.  Although disclosing his interest and "formally" abstaining from voting on the loan, Defendant O'Keeffe promoted the loan, was present at the May 14, 2008 SLC approval meeting, and had substantial involvement with the Borrower F Loan.

88.     The Defendants approving the Borrower F Loan engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

> a.  Defendants failed to identify reasonably reliable and adequate sources of repayment for this loan.  The borrowers' financials showed that their total net income would barely cover the interest on the loan and the loan with the prior lender was in default.  The net operating income of each mobile home park had declined over the preceding 4 years and there existed significant vacancy

rates for both parks, in large part due to worsening economic conditions, as noted in May 14, 2008 CCAM, stating: "Occupancy has declined over the past three years due to economic conditions in Saginaw and Genesee County."

b. Defendants approved the loan prior to the receipt of appraisals on the mobile home parks. When appraisals were belatedly obtained from an unapproved appraiser, multiple reviewing appraisers warned of serious issues with the appraisals and the mobile home parks themselves, including that the appraisals' valuations were "optimistic," as the properties were "distressed," "troubled," and suffering from "horrific vacancies." Indeed, review appraisal memoranda noted a "downward spiral in occupancy," with 41.9% and 54.6% occupancy at the respective parks, as well as "years of underperformance" and "many negative demographics." Extensive discussions among the approving Defendants followed but, despite this additional adverse information, they nevertheless decided to fund the $16 million loan.

c. Defendants' approval of the loan violated the Bank's LTOB limit as the borrowers' principal and related entities had already approximately $10 million in loans with the Bank. Prior to approval of the instant loan, Mr. F, a principal of the borrowers and guarantor of the instant $16 million line of credit, already had $9.9 million in existing exposure with the Bank through several open lines of credit and other various loans. As expressly noted in the May 14, 2008 CCAM, upon approval of the line of credit, the total credit exposure to Mr. F exceeded the $25 million in-house lending limit to one borrower. Moreover, Mr. F's then existing exposure was in the form of

numerous open lines of credit and other various loans, the majority of which were already fully drawn, and several of Mr. F's various deposit accounts with the Bank were regularly overdrawn.

d.  The loan exceeded the Bank's LTV limitations.  The loan was originally approved with a maximum LTV of 75%.  Approximately a week after the approval, concurrence approvals were provided to raise the maximum LTV to 80%.  Review appraisal memoranda, however, found that the combined value should be only $18.3 million, thereby resulting in an approximately 87% LTV, well above the already-raised approved LTV of 80%, and the LTV limit set in the Loan Policy.

e.  Defendants approved this loan despite the fact that the mobile home parks are located in Michigan, *i.e.*, outside the Bank's typical geographic lending area, and without regard for the Loan Policy requirement that out-of-area loans required stronger borrowers and security.  The loan was also outside the Bank's general lending loan type as mobile home parks are "special or limited purpose properties" which present significant additional risk.

f.  Defendant O'Keeffe's ownership interest in Borrower F's business constituted a conflict of interest which was not resolved by merely abstaining from the SLC vote but required the Defendants approving this loan to present the loan to the Bank's Board of Directors in accordance with the Loan Policy. Defendant O'Keeffe's conflict of interest was apparent during the approval process as additional collateral was to be obtained in the event appraisals did not support the required LTV ratios.  When that occurred, Defendant

Caravello asked that additional collateral be obtained. Defendant O'Keeffe intervened to argue that the collateral that had been initially obtained was sufficient. A mortgage for certain additional collateral was never recorded.

89.     When the loan matured, Borrower F was unable to repay the loan due to inadequate cash flow. Defendants, however, extended the loan on multiple occasions with reduced interest rates to defer loss recognition in violation of the Loan Policy prohibition on capitalizing interest. Borrower F's cash flow continued to be inadequate to repay the loan and the collateral was insufficient to satisfy the loan.

90.     As a result of the negligence, gross negligence, and breaches of fiduciary duties by Defendants Caravello, Fritz, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, and Stoll, with respect to the Borrower F Loan, the FDIC-R incurred damages in excess of $11.1 million.

## C.    Director Defendants' Tortious Conduct in Connection with Securities Losses

### The OTTI Dispute and New Policy

91.     Midwest had an unusually high concentration of its assets in its investment securities portfolio. As with many banks, the investment securities portfolio included debt instruments issued by two Government Sponsored Enterprises ("GSEs"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). But Midwest concentrated a significant portion of its investment securities portfolio in riskier equity securities being issued by the GSEs in the form of preferred stock.

92.     By year-end 2004, one of GSE preferred stock issues that Midwest had earlier acquired for $38 million had lost $10.1 million in value.

93.     Under accounting rules, Midwest was required to periodically adjust on its books the value of these equity securities and was required to reflect an "impairment" when the value

has dropped below acquisition cost or basis value. An impairment may be temporary if the value is justifiably expected to return to the basis value. But where the security cannot be justifiably expected to return to the basis value, it must be classified "other-than-temporarily impaired" ("OTTI"). When this occurs, the Bank is required to take a charge against earnings in its income statement, the effect of which is like writing off the investment as a loss.

94.     In connection with Midwest's 2004 audit, the Bank's independent accountants, McGladrey & Pullen LLP ("McGladrey"), recommended that the GSE preferred stock that had lost $10.1 million in value be classified as OTTI following McGladrey's assessment that there was no objective basis to conclude that the stock's value would recover within a reasonable period of time and that the Bank's management was unable to document any justification other than its opinion.

95.     In order to improve the Bank's reported year-end financial condition, Midwest's directors wanted to delay the OTTI recognition. They resisted McGladrey's recommendation because a $10.1 million decrease in the Bank's earnings would have reduced its income by half and would have nearly eliminated MBHI's income for 2004. Midwest's directors argued with McGladrey over the test for OTTI classification, stating that the Bank had the intention and ability to hold the stock until it recovered its value. But McGladrey noted that the Bank lacked objective evidence and the ability to demonstrate that the stock was justifiably expected to recover its value.

96.     On January 27, 2005, without McGladrey's approval, MBHI publically released its 2004 earnings without the Bank recognizing the OTTI loss on its GSE preferred stock.

97.     As a result, on February 21, 2005, McGladrey made a finding that, contrary to management's position, the Bank's GSE preferred stock was OTTI. McGladrey also concluded

that Midwest had a "material weakness" in its internal controls based on management's inability to obtain and evaluate evidence to support its assertion that the decline in the market value of the GSE preferred stock was temporary rather than other-than-temporary.  The material weakness finding was included in MBHI's 2004 Securities and Exchange Commission ("SEC") Form 10-K dated March 9, 2005.

98.     McGladrey's finding caused the Bank to classify the GSE preferred stock as OTTI.  On February 24, 2005, almost immediately after McGladrey's decision, the Bank sold all of its OTTI GSE preferred stock, despite its earlier stated intention to hold the stock based on its expectation that it would recover its value.

99.     On February 28, 2005, MBHI issued a press release explaining that the Bank had sold its GSE preferred stock because "[i]t is the practice of the Company not to retain securities that are classified other-than-temporarily impaired."  The press release also acknowledged that it would have to restate its 2004 earnings as a result of the reclassification of the Bank's GSE preferred stock.  In the press release, Defendant Giancola stated: "We're more than a little embarrassed by the need to issue a revised earnings release."  Midwest also sent the press release to its regulator, the FRB, on February 28, 2005.

100.     The Bank thereafter restated this practice in public securities filings, signed individually by each director, including its 2004 10-K, an amended 2004 10-K dated May 20, 2005, and in its 2005 10-K dated March 15, 2006.  In each of these public filings, Midwest repeated: "It is the practice of the Company not to retain securities that are classified other-than-temporarily impaired."

101.     This announced practice protected Midwest's safety and soundness because it ensured that the Bank divested an impaired OTTI security under objective parameters to avoid

the risk that the value of the impaired OTTI security would continue to drop, taking the Bank's earnings and capital down with it.

102.    A May 3, 2005 internal memorandum summarized this policy regarding OTTI classification.  First, management acknowledged that the Bank had had a material weakness in determining whether impairment in the value of GSE preferred stock held in 2004 was other-than-temporary.  Second, management announced that it had "taken the following steps to prevent and eliminate this material weakness in future periods," including: (1) replacing the Chief Investment Officer; (2) revising the investment policy and procedures; (3) immediately selling the Bank's impaired OTTI securities notwithstanding its prior plan to retain the stock at least through June 2005; and (4) "Expand[ing] its documentation and process for evaluating securities that may be or subsequently become" OTTI.

103.    Defendant Giancola prepared a memorandum in February 2005 describing lessons learned from what he called the Fannie Mae preferred stock write-down "fiasco." In it he noted that the Bank should never acquire such a large block of thinly-traded securities like the GSE preferred stock, which he described as having been a "big bet."

### The 2008 OTTI Policy Violation and Resulting Loss

104.    Notwithstanding that lesson, under Defendant Giancola's direction, starting in 2006 Midwest resumed acquiring new issues of GSE preferred stock.  Although the subprime housing crisis was beginning to threaten the viability of the GSEs, Midwest continued to acquire an even larger concentration of GSE preferred stock, totaling $85.1 million.  But like the GSE preferred stock investments before, the new investments began losing value after their purchase and, by the end of 2007, had lost $19 million of their value.

105.     As a result, Midwest's Board of Directors was again facing the threat of a large

loss on GSE preferred stock.  This time, however, the Bank had publicly-announced practices

and procedures in place to address that issue.

106.     As in 2004, the Board of Directors, including Defendants Giancola, Fritz,

DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, resisted recognizing

an OTTI charge in its 2007 year-end financial statement.  Its new independent auditor,

PricewaterhouseCoopers LLP ("PwC"), advised that if an OTTI charge was not taken in 2007,

the 2007 10-K needed to disclose that Midwest would take an OTTI charge in March 2008 if the

GSE preferred stock did not recover its value by then.

107.     At its January 29, 2008 and March 20, 2008 meetings, the ALCO, including

Defendants Giancola, Fritz, Forrester, Genetski, Livingston, and Silveri, debated whether to hold

or sell the stock without mentioning the Bank's policy to liquidate stock classified OTTI.

108.     At the Board of Directors' March 9, 2008 meeting, Defendant Audit Committee

Chairman Hartley advised the Board that this OTTI issue "was not going away" and would be

revisited at the end of March 2008.  The Board of Directors discussed how the pending OTTI

classification might adversely affect the Bank's earnings and capital and limit its ability to pay

dividends to the Holding Company but no one in the Board meeting discussed or even referred to

the Bank's policy to liquidate stock classified OTTI.

109.     Midwest formally recognized a $17.6 million OTTI loss in its GSE preferred

stock as of March 31, 2008 and stated that the impairment was attributable to current economic

conditions and that "recovery does not appear likely in the near future."

110.     Defendant Giancola had the authority to sell the GSE preferred stock and should

have done so under the Bank's policy after it became classified OTTI.  Instead, on April 21,

2008, the Bank issued a press release stating that it "does not intend to sell these securities for liquidity purposes and has no other plan to sell these securities in the near term."

111.    At an April 29, 2008 Board of Directors' meeting, at which Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin were present, there was an extensive discussion of the $17 million OTTI charge taken as of March 31, 2008, including that the OTTI charge caused the Bank to have negative quarterly earnings and that a further decrease in the value of the GSE preferred stock could lead to another OTTI charge. No director, however, discussed the policy requiring that OTTI stock be sold or questioned why it was being ignored.

112.    At a July 22, 2008 ALCO meeting, at which Defendants Giancola, Fritz, Forrester, Genetski, Livingston, and Silveri were present, the ALCO committee decided that, due to the risky nature of the GSE preferred stock, the Bank should not be allowed to purchase any additional GSE preferred stock. Thereafter a "focused discussion" of the GSE preferred stock followed, including a presentation by Defendant Forrester showing the stock's decline in value over the last twelve months. After the discussion, the committee noted that the Bank had the ability and intent to hold the stock until it recovers and again failed to discuss the Bank's policy "not to retain securities that are classified [OTTI]." But, as with their 2005 experience, Defendants lacked objective evidence and the ability to demonstrate that the stock was justifiably expected to return to the basis value and, in fact, the stock's impairment had already been recognized as not temporary.

113.    Later that same day, the full Board of Directors, including Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, and Silveri, discussed the fact that the GSE preferred stock's value continued to be "under pressure" and that following the $17 million

March OTTI charge, the stock had dropped an additional $20 million. Rather than question why the Bank's policy "not to retain securities that are classified [OTTI]" had not been followed, the minutes note that Board of Directors acknowledged that the Bank's management intends to continue to hold the preferred stock and "see how the investment performs."

114.    At the August 26, 2008 Board of Directors' meeting, at which Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, and Silveri were present, with the stock value having dropped yet another $18 million in value, it was asked whether Midwest should sell the securities or instead hold them but write them down to see if the market recovered. A prolonged discussion occurred at this point but, again, no reference to the Bank's policy "not to retain securities that are classified [OTTI]" was made. This hand-wringing exercise over whether to hold or sell OTTI stock while the stock continued to drop in value, thereby costing additional millions of dollars, was the very problem that the Bank's policy announced in 2005 was designed to prevent.

115.    The failure to liquidate the securities in accordance with the policy, after the Bank itself had formally recognized the $17.6 million OTTI charge on March 31, 2008, caused an additional $66.3 million in losses that would have been entirely avoided had the Director Defendants followed the Bank's policy and sold the stock when it became OTTI on March 31, 2008. The $66.3 million loss is over and above the initial $17.6 million OTTI charge.

116.    On September 7, 2008, the Federal Housing Finance Authority ("FHFA") placed Fannie Mae and Freddie Mac into conservatorship, suspended all stock dividends, and issued $1 billion in new Senior Preferred Stock in each GSE to raise additional capital. These events reduced the value of Midwest's GSE preferred stock nearly to zero.

117.    The negligence, gross negligence, and breaches of fiduciary duties of Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, with respect to the securities losses, caused the FDIC-R to incur damages in excess of $66.3 million.

# V.

## CLAIMS FOR RELIEF

### COUNT I
### GROSS NEGLIGENCE (Violation of 12 U.S.C. § 1821(k))
### IN CONNECTION WITH BORROWERS A THROUGH F

118.    The FDIC-R realleges and incorporates herein by this reference each of the allegations contained in paragraphs 1 through 117 as though fully set forth herein.

119.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law. Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

120.    Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin owed a duty to use reasonable care, skill, and diligence in the performance of their duties in connection with borrowers A through F as described above, including, but not limited to:

    a.  complying with the Loan Policy and ensuring that the loans they approved complied with the Loan Policy;

    b.  conducting proper due diligence on each proposed loan and informing themselves about the risks the loan posed before approving and renewing it;

c.  ensuring that the loans they approved were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d.  ensuring that the loans they approved had reasonably reliable and adequate sources of repayment indentified;

e.  ensuring that the loans they approved were to creditworthy borrowers;

f.  ensuring that the loans they approved were secured by sufficiently valuable collateral and backed by effective payment guarantees to prevent or minimize the risk of loss;

g.  ensuring that safe and sound loan to value ratio limits were followed;

h.  ensuring that adequate and appropriate restrictions and control were placed on the borrower's use of loaned funds and that the uses were properly monitored;

i.  ensuring that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

j.  obtaining and evaluating information that demonstrated the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

k.  ensuring that the loans they approved did not violate applicable banking laws and regulations;

l.  ensuring proper loss recognition on the loans and that renewals were not made to delay loss recognition on the loans;

    m.  ensuring that the loans they approved did not create unsafe and unsound concentrations of credit;

    n.  properly monitoring the performance of loans to minimize the risk of loss; and

    o.  heeding warnings by the FRB and IDFPR about the Bank's lending operations.

121.    Given the receipt of specific warnings by the FRB and IDFPR and their knowledge of the impaired state of the real estate market, the responsibilities of Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin were heightened.

122.    Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, in causing the loan transactions to be approved and/or renewed to borrowers A through F, breached their duties and were grossly negligent by, among other things:

    a.  disregarding the Loan Policy in approving and renewing the loan transactions on terms that violated the Loan Policy;

    b.  failing to conduct proper due diligence on each of the loan transactions and failing to inform themselves about the risks the loans posed before approving and renewing them;

    c.  failing to ensure that the loan transactions were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

    d.  failing to ensure that the loan transactions had reasonably reliable and adequate sources of repayment indentified;

e.   approving the loan transactions to uncreditworthy borrowers that were known to be experiencing financial difficulty;

f.   failing to ensure that the loan transactions were secured by sufficiently valuable collateral and guarantees to prevent or minimize the risk of loss;

g.   failing to ensure that safe and sound loan to value ratio limits were followed;

h.   failing to ensure that adequate and appropriate restrictions and control were placed on the borrower's use of loaned funds and that the uses were properly monitored;

i.   failing to ensure that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

j.   failing to obtain and evaluate information demonstrating the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

k.   failing to ensure that the loan transactions did not violate applicable banking laws and regulations;

l.   failing to ensure proper loss recognition on the loan transactions and that renewals were not made to delay loss recognition on those loans;

m.  failing to ensure that the loan transactions did not create unsafe and unsound concentrations of credit;

n.   failing to properly monitor the performance of loans to minimize the risk of loss; and

    o.   ignoring warnings by the FRB and IDFPR about the Bank's lending

        operations.

123.    Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe,

Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin

knew or should have known of the risks that such deficient practices represented but they

persisted in this grossly negligent conduct by approving the loan transactions. This was very

great or gross negligence. It also was reckless.

124.    As a direct and proximate result of the gross negligence of Defendants Giancola,

Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo,

Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, the FDIC-R suffered

damages in an amount to be determined at trial.

## COUNT II
## NEGLIGENCE (Illinois Law)
## IN CONNECTION WITH BORROWERS A THROUGH F

125.    The FDIC-R realleges and incorporates herein by this reference each of the

allegations contained in paragraphs 1 through 117 as though fully set forth herein.

126.    Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe,

Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin

owed a duty to use reasonable care, skill, and diligence in the performance of their duties in

connection with borrowers A through F as described above, including, but not limited to:

    a.   complying with the Loan Policy and ensuring that the loans they approved

        complied with the Loan Policy;

    b.   conducting proper due diligence on each proposed loan and informing

        themselves about the risks the loan posed before approving and renewing it;

c. ensuring that the loans they approved were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d. ensuring that the loans they approved had reasonably reliable and adequate sources of repayment indentified;

e. ensuring that the loans they approved were to creditworthy borrowers;

f. ensuring that the loans they approved were secured by sufficiently valuable collateral and backed by effective payment guarantees to prevent or minimize the risk of loss;

g. ensuring that safe and sound loan to value ratio limits were followed;

h. ensuring that adequate and appropriate restrictions and control were placed on the borrower's use of loaned funds and that the uses were properly monitored;

i. ensuring that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

j. obtaining and evaluating information that demonstrated the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

k. ensuring that the loans they approved did not violate applicable banking laws and regulations;

l. ensuring proper loss recognition on the loans and that renewals were not made to delay loss recognition on the loans;

    m.  ensuring that the loans they approved did not create unsafe and unsound

        concentrations of credit;

    n.  properly monitoring the performance of loans to minimize the risk of loss; and

    o.  heeding warnings by the FRB and IDFPR about the Bank's lending

        operations.

127.    Given the receipt of specific warnings by the FRB and IDFPR and their

knowledge of the impaired state of the real estate market, the responsibilities of Defendants

Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll,

DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin were heightened.

128.    Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe,

Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin,

in causing the loan transactions to be approved and/or renewed to borrowers A through F,

breached their duties and were negligent by, among other things:

    a.  disregarding the Loan Policy in approving and renewing the loan transactions

        on terms that violated the Loan Policy;

    b.  failing to conduct proper due diligence on each of the loan transactions and

        failing to inform themselves about the risks the loans posed before approving

        and renewing them;

    c.  failing to ensure that the loan transactions were underwritten in a safe and

        sound manner and that appropriate and current financial documentation was

        required and provided;

    d.  failing to ensure that the loan transactions had reasonably reliable and

        adequate sources of repayment indentified;

e. approving the loan transactions to uncreditworthy borrowers that were known to be experiencing financial difficulty;

f. failing to ensure that the loan transactions were secured by sufficiently valuable collateral and guarantees to prevent or minimize the risk of loss;

g. failing to ensure that safe and sound loan to value ratio limits were followed;

h. failing to ensure that adequate and appropriate restrictions and control were placed on the borrower's use of loaned funds and that the uses were properly monitored;

i. failing to ensure that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

j. failing to obtain and evaluate information demonstrating the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

k. failing to ensure that the loan transactions did not violate applicable banking laws and regulations;

l. failing to ensure proper loss recognition on the loan transactions and that renewals were not made to delay loss recognition on those loans;

m. failing to ensure that the loan transactions did not create unsafe and unsound concentrations of credit;

n. failing to properly monitor the performance of loans to minimize the risk of loss; and

o. ignoring warnings by the FRB and IDFPR about the Bank's lending operations.

129.     Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin are not entitled to the application of the business judgment rule because none of those Defendants' actions or inactions, which are the basis of this claim, were taken in good faith, nor were those Defendants reasonably well-informed in taking such actions or inactions.

130.     As a direct and proximate result of the negligence of Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, the FDIC-R suffered damages in an amount to be determined at trial.

**COUNT III**
**BREACH OF FIDUCIARY DUTIES (Illinois Law)**
**IN CONNECTION WITH BORROWERS A THROUGH F**
**[IN THE ALTERNATIVE TO COUNT II]**

131.     The FDIC-R realleges and incorporates herein by this reference each of the allegations contained in paragraphs 1 through 117 as though fully set forth herein.

132.     The allegations of breach of fiduciary duties in this Count III are pleaded in the alternative to the allegations of negligence in Count II.

133.     Based on their positions as officers and directors, Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin were fiduciaries of the Bank.

134.     Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin had fiduciary duties to exercise reasonable care, skill, and diligence in the performance of their

responsibilities in connection with borrowers A through F as described above, including, but not limited to:

a.   complying with the Loan Policy and ensuring that the loans they approved complied with the Loan Policy;

b.   conducting proper due diligence on each proposed loan and informing themselves about the risks the loan posed before approving and renewing it;

c.   ensuring that the loans they approved were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d.   ensuring that the loans they approved had reasonably reliable and adequate sources of repayment indentified;

e.   ensuring that the loans they approved were to creditworthy borrowers;

f.   ensuring that the loans they approved were secured by sufficiently valuable collateral and backed by effective payment guarantees to prevent or minimize the risk of loss;

g.   ensuring that safe and sound loan to value ratio limits were followed;

h.   ensuring that adequate and appropriate restrictions and control were placed on the borrower's use of loaned funds and that the uses were properly monitored;

i.   ensuring that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

j.   obtaining and evaluating information that demonstrated the feasibility and marketability of acquisition, development, and construction projects to ensure

that they were likely to result in a repayment of the loan upon project
completion;

k.  ensuring that the loans they approved did not violate applicable banking laws
and regulations;

l.  ensuring proper loss recognition on the loans and that renewals were not made
to delay loss recognition on the loans;

m.  ensuring that the loans they approved did not create unsafe and unsound
concentrations of credit;

n.  properly monitoring the performance of loans to minimize the risk of loss; and

o.  heeding warnings by the FRB and IDFPR about the Bank's lending
operations.

135.  Given the receipt of specific warnings by the FRB and IDFPR and their
knowledge of the impaired state of the real estate market, the responsibilities of Defendants
Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll,
DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin were heightened.

136.  Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe,
Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin,
in causing the loan transactions to be approved and/or renewed to borrowers A through F,
breached their fiduciary duties by, among other things:

a.  disregarding the Loan Policy in approving and renewing the loan transactions
on terms that violated the Loan Policy;

- 56 -

b.  failing to conduct proper due diligence on each of the loan transactions and failing to inform themselves about the risks the loans posed before approving and renewing them;

c.  failing to ensure that the loan transactions were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d.  failing to ensure that the loan transactions had reasonably reliable and adequate sources of repayment indentified;

e.  approving the loan transactions to uncreditworthy borrowers that were known to be experiencing financial difficulty;

f.  failing to ensure that the loan transactions were secured by sufficiently valuable collateral and guarantees to prevent or minimize the risk of loss;

g.  failing to ensure that safe and sound loan to value ratio limits were followed;

h.  failing to ensure that adequate and appropriate restrictions and control were placed on the borrower's use of loaned funds and that the uses were properly monitored;

i.  failing to ensure that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

j.  failing to obtain and evaluate information demonstrating the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

k.   failing to ensure that the loan transactions did not violate applicable banking laws and regulations;

l.   failing to ensure proper loss recognition on the loan transactions and that renewals were not made to delay loss recognition on those loans;

m.   failing to ensure that the loan transactions did not create unsafe and unsound concentrations of credit;

n.   failing to properly monitor the performance of loans to minimize the risk of loss; and

o.   ignoring warnings by the FRB and IDFPR about the Bank's lending operations.

137.   Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin are not entitled to the application of the business judgment rule because none of those Defendants' actions or inactions, which are the basis of this claim, were taken in good faith, nor were those Defendants reasonably well-informed in taking such actions or inactions.

138.   As a direct and proximate result of the breaches of fiduciary duties by Defendants Giancola, Fritz, Caravello, Bernstein, Hackett, Henthorn, O'Keeffe, Ptacin, Spear, Stoll, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, the FDIC-R suffered damages in an amount to be determined at trial.

**COUNT IV**
**GROSS NEGLIGENCE (Violation of 12 U.S.C. § 1821(k))**
**SECURITIES LOSSES**

139.   The FDIC-R realleges and incorporates herein by this reference each of the allegations contained in paragraphs 1 through 117 as though fully set forth herein.

140.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law. Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

141.    Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin owed a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to:

a.  formulating and approving prudent policies and practices for the safe and sound conduct of the Bank's investment securities functions;

b.  ensuring that the Bank's policies and practices are followed;

c.  ensuring that bank laws and regulations are followed;

d.  being informed of the Bank's financial condition and investment policies; and

e.  effectively supervising the Bank's affairs.

142.    Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin breached their duties and were grossly negligent by, among other things:

a.  failing to be aware of the Bank's policy and practice providing that the Bank not retain securities in its portfolio that have been classified OTTI;

b.  failing to adequately inform themselves of the relevant policy and practice providing that the Bank not retain securities in its portfolio that have been classified OTTI in order to make informed decisions about which they were being asked to address in late 2007 and early 2008 concerning the GSE

      preferred stock which was expected to be classified OTTI in the first quarter

      of 2008; and

  c.  failing to require compliance with the Bank's policy and practice of not

      retaining securities that have been classified OTTI, at least by the April 29,

      2008 Board of Directors' meeting when the Director Defendants were

      formally notified that Bank's $85.1 million holding of GSE preferred stock

      had been classified OTTI.

143.    Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin knew or should have known of the risks that such deficient practices represented but they persisted in this grossly negligent conduct. This was very great or gross negligence. It also was reckless.

144.    Given the warning by the Bank's independent accountants in the 2004 10-K concerning the material weakness in internal control relating to its investment securities portfolio reporting and the response formulated by the Board of Directors, the prior experience with losses on GSE preferred stock, and the size of the Bank's investment in that type of security, the responsibilities of Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin with respect to investments in GSE preferred stock were heightened.

145.    As a direct and proximate result of the gross negligence of Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, the FDIC-R suffered damages in an amount to be determined at trial.

**COUNT V**
**NEGLIGENCE (Illinois Law)**
**SECURITIES LOSSES**

146.     The FDIC-R realleges and incorporates herein by this reference each of the allegations contained in paragraphs 1 through 117 as though fully set forth herein.

147.     Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin owed a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to:

     a.   formulating and approving prudent policies and practices for the safe and sound conduct of the Bank's investment securities functions;

     b.   ensuring that the Bank's policies and practices are followed;

     c.   ensuring that bank laws and regulations are followed;

     d.   being informed of the Bank's financial condition and investment policies; and

     e.   effectively supervising the Bank's affairs.

148.     Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin breached their duties and were negligent by, among other things:

     a.   failing to be aware of the Bank's policy and practice providing that the Bank not retain securities in its portfolio that have been classified OTTI;

     b.   failing to adequately inform themselves of the relevant policy and practice providing that the Bank not retain securities in its portfolio that have been classified OTTI in order to make informed decisions about which they were being asked to address in late 2007 and early 2008 concerning the GSE preferred stock which was expected to be classified OTTI in the first quarter of 2008; and

    c.   failing to require compliance with the Bank's policy and practice of not

retaining securities that have been classified OTTI, at least by the April 29,

2008 Board of Directors' meeting when the Director Defendants were

formally notified that Bank's $85.1 million holding of GSE preferred stock

had been classified OTTI.

149.    Given the warning by the Bank's independent accountants in the 2004 10-K

concerning the material weakness in internal control relating to its investment securities portfolio

reporting and the response formulated by the Board of Directors, the prior experience with losses

on GSE preferred stock, and the size of the Bank's investment in that type of security, the

responsibilities of Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston,

Rizza, Silveri, and Wolin with respect to investments in GSE preferred stock were heightened.

150.    Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston,

Rizza, Silveri, and Wolin are not entitled to the application of the business judgment rule

because none of those Defendants' actions or inactions, which are the basis of this claim, were

taken in good faith, nor were those Defendants reasonably well-informed in taking such actions

or inactions.

151.    As a direct and proximate result of the negligence of Defendants Giancola, Fritz,

DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, the FDIC-R

suffered damages in an amount to be determined at trial.

**COUNT VI**
**BREACH OF FIDUCIARY DUTIES (Illinois Law)**
**SECURITIES LOSSES**
**[IN THE ALTERNATIVE TO COUNT V]**

152.    The FDIC-R realleges and incorporates herein by this reference each of the

allegations contained in paragraphs 1 through 117 as though fully set forth herein.

153.     The allegations of breach of fiduciary duties in this Count VI are pleaded in the alternative to the allegations of negligence in Count V.

154.     Based on their positions as directors, Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin were fiduciaries of the Bank.

155.     Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin owed fiduciary duties to exercise reasonable care, skill, and diligence in the performance of their responsibilities, including, but not limited to:

    a.   formulating and approving prudent policies and practices for the safe and sound conduct of the Bank's investment securities functions;

    b.   ensuring that the Bank's policies and practices are followed;

    c.   ensuring that bank laws and regulations are followed;

    d.   being informed of the Bank's financial condition and investment policies; and

    e.   effectively supervising the Bank's affairs.

156.     Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin breached their fiduciary duties by, among other things:

    a.   failing to be aware of the Bank's policy and practice providing that the Bank not retain securities in its portfolio that have been classified OTTI;

    b.   failing to adequately inform themselves of the relevant policy and practice providing that the Bank not retain securities in its portfolio that have been classified OTTI in order to make informed decisions about which they were being asked to address in late 2007 and early 2008 concerning the GSE preferred stock which was expected to be classified OTTI in the first quarter of 2008; and

c.  failing to require compliance with the Bank's policy and practice of not retaining securities that have been classified OTTI, at least by the April 29, 2008 Board of Directors' meeting when the Director Defendants were formally notified that Bank's $85.1 million holding of GSE preferred stock had been classified OTTI.

157.  Given the warning by the Bank's independent accountants in the 2004 10-K concerning the material weakness in internal control relating to its investment securities portfolio reporting and the response formulated by the Board of Directors, the prior experience with losses on GSE preferred stock, and the size of the Bank's investment in that type of security, the responsibilities of Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin with respect to investments in GSE preferred stock were heightened.

158.  Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin are not entitled to the application of the business judgment rule because none of those Defendants' actions or inactions, which are the basis of this claim, were taken in good faith, nor were those Defendants reasonably well-informed in taking such actions or inactions.

159.  As a direct and proximate result of the breaches of fiduciary duties by Defendants Giancola, Fritz, DiPaolo, Forrester, Genetski, Hartley, Livingston, Rizza, Silveri, and Wolin, the FDIC-R suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the FDIC-R demands a trial by jury and judgment in its favor and against the Defendants, as follows:

A.  Determining the amount of damages caused by Defendants;

B.  Determining the amount of accrued interest and pre-judgment interest, pursuant to

12 U.S.C. § 1821(l), on such damages;

C.  Awarding the FDIC-R the full amount thereof;

D.  Awarding the FDIC-R its costs and other expenses incurred by it in connection

with this proceeding; and

E.  Granting the FDIC-R such other and further relief as this Court may deem just

and proper under the circumstances.

**JURY DEMAND**

THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR
MIDWEST BANK AND TRUST COMPANY REQUESTS A TRIAL BY JURY ON ALL
ISSUES TRIABLE OF RIGHT BY JURY.

Dated: April 30, 2013

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for Midwest Bank and Trust Company**

  /s/ Steven K. White
One of Its Attorneys

Steven K. White, Bar No. 367371
Katherine M. Sutcliffe Becker, Bar No. 481394
Matthew C. Smilowitz, Bar No. 501077
**STINSON MORRISON HECKER LLP**
1775 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Telephone: (202) 785-9100
Facsimile: (202) 572-9963
swhite@stinson.com
kbecker@stinson.com
msmilowitz@stinson.com

Robert L. Wainess, Bar No. 121137
Counsel, Professional Liability Unit
FDIC Legal Division
3501 Fairfax Drive, B7034
Arlington, VA 22226
Telephone: (703) 516-5285
Facsimile: (703) 516-5445
rwainess@fdic.gov

Paul Carroll (ARDC No. 6196314)
Gould & Ratner LLP
222 North LaSalle Street, Suite 800
Chicago, IL 60601
Telephone: (312) 899-1657
Facsimile:  (312) 236-3241
pcarroll@gouldratner.com