IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL DEPOSIT INSURANCE, )
CORPORATION, as Receiver for )
Midwest Bank and Trust Company, )
)
    Plaintiff, )
) No. 13 C 3230
vs. )
) Magistrate Judge Schenkier
James J. Giancola *et al.*, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Defendants James Giancola, Sheldon Bernstein, Thomas Caravello, Angelo DiPaolo, Barry Forrester, Robert Genetski, Thomas Hackett, Jerry Hartley, Mary Henthorn, Margaret Livingston, Joe Rizza, Eugene Silveri, John Spear, William Stoll, and Leon Wolin (collectively, "Defendants") move to compel Plaintiff Federal Deposit Insurance Corporation, as Receiver for Midwest Bank and Trust Company ("FDIC-R"), to produce a document called an Asset Valuation Review ("AVR") and to provide testimony relating to this document pursuant to Federal Rules of Civil Procedure 30(b)(6) and 34 (doc. # 111). Defendants Kelly O'Keeffe, Brogan Ptacin, and Jerome Fritz have joined in that motion (doc. # 114). FDIC-R objects to the motion, arguing that the document is irrelevant to these proceedings and is also protected by the deliberative process privilege (doc. # 115). After reviewing the AVR and related documents *in camera*, we conclude that the deliberative process privilege does not apply and that the AVR is relevant to these proceedings. FDIC-R shall therefore produce the AVR to Defendants by October 5, 2015, and shall produce a Rule 30(b)(6) witness to testify about this document by October 30, 2015.

## I.

In May 2010, the Illinois Department of Financial Professional Regulation closed Midwest Bank and Trust Company ("Midwest") and appointed FDIC-R as its receiver (doc. # 111: Defs.' Mot. to Compel ("Defs.' Mot.") at 2). FDIC-R subsequently entered into a purchase and assumption agreement with FirstMerit Bank, whereby FirstMerit assumed Midwest's assets and liabilities, including 20 percent of post-closing losses on transferred loans (*Id.*). FDIC-R, for its part, agreed to assume the remaining 80 percent of post-closing losses on the transferred loans (*Id.*).

On April 30, 2013, FDIC-R sued various former directors and officers of Midwest, alleging negligence, gross negligence, and breach of fiduciary duty with respect to six specific loans and claimed damages of at least $62 million (doc. #1). Discovery commenced soon thereafter, but it was not until 2015, according to Defendants, that they first learned that prior to entering into the agreement with FirstMerit, FDIC's Franchise Asset Marketing Branch ("FAMB") had retained Garnet Capital Advisors ("Garnet") to perform a market pricing valuation of Midwest's loan portfolio (Defs.' Mot. at 3). Defendants now seek the production of that valuation—the AVR—on the ground that the document is relevant to their defenses as it provides important evidence of the quality and performance of Midwest's loan portfolio, including the six target loans (*Id.* at 5-8). FDIC-R argues otherwise, claiming that the document is irrelevant to the lawsuit and also protected by the deliberative process privilege (Doc. # 115: FDIC-R's Mem. in Opp. to Defs.' Mot. to Compel ("FDIC-R's Mem.") at 1-2).[1]

---

[1] Defendants suggest that FDIC-R's assertion of privilege is untimely because the AVR should have been produced long ago pursuant to Defendants' Request to Produce No. 32, which sought all documents "relating to any and all efforts by any regulator to sell Midwest or any of its assets in connection with its failure" (Defs.' Mot. at 3, 9). Defendants also sought discovery pertaining to their damages claim, including "additional collections or payments relating to the target loans" (*Id.* at 3). FDIC-R disagrees, stating that the AVR is not responsive to Defendants' discovery requests and that FDIC-R properly objected to the document requests on relevance grounds

2

After Defendants' motion to compel was fully briefed, the Court asked FDIC-R to submit the AVR for *in camera* review. In compliance with that request, FDIC-R submitted four documents. The first document is the nine-page AVR created by Garnet. The second document is a three-page spreadsheet of unclear authorship containing various valuations that occasionally appear within the AVR. The third and fourth documents are large excel spreadsheets containing names, addresses and loan categories, among other information.[2]

## II.

The deliberative process privilege seeks to protect the decision-making processes of government agencies by promoting "'frank discussion of legal or policy matters,'" free from inhibitions that could result if agencies knew these discussions would be made public. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)). The privilege extends to "'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Patrick v. City of Chicago*, -- F. Supp. 3d --, No. 14 C 3658, 2015 WL 3989152, at *4 (N.D. Ill., July 1, 2015) (quoting *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001)); *see also United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) ("The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency"). As further elaborated by the Seventh Circuit, the privilege applies "to predecisional policy discussions . . . and to

---

(FDIC-R's Mem. at 3). We bypass the question of timeliness in favor of resolving on the merits the ultimate issue of whether the document is discoverable.

[2] Since FDIC-R submitted these additional documents to us as part of the AVR *in camera* review, we treat them as part of the AVR and thus included in our analysis as to whether the AVR must be produced.

factual matters inextricably intertwined with such discussions," *Enviro Tech Int'l, Inc. v. U.S. E.P.A.*, 371 F.3d 370, 374–75 (7th Cir. 2004), but not to purely factual material, documents reflecting an agency's final policy decisions, or communications made after an agency has arrived at its decision. *K.L. v. Edgar*, 964 F. Supp. 1206, 1208 (N.D. Ill. 1997). Accordingly, in this circuit, the determination of whether a document falls within the privilege's domain is whether it is "predecisional in the sense that it is actually antecedent to the adoption of an agency policy, and deliberative in the sense that it is actually . . . related to the process by which policies are formulated." *Enviro Tech*, 371 F.3d at 375 (internal citations and quotations omitted). The agency "bears the burden of proving what deliberative process was involved and what role the document played in that process." *King v. Internal Revenue Serv.*, 684 F.2d 517, 519 (7th Cir. 1982).

Many cases analyzing the applicability of the deliberative process privilege address whether the disputed communications involved "the process by which *policies* are formulated." *Enviro Tech*, 371 F.3d at 371 (emphasis added); *Kennedy v. U.S. E.E.O.C.*, No. 1:14-cv-00374-JMS-MJD, 2014 WL 4908716, at *4 (S.D. Ind., Sept. 29, 2014). However, the Seventh Circuit also has applied the privilege in cases where the communications at issue involved how a governmental agency intended to rule in a particular, individual situation—as opposed to only cases involving policy determinations made on a broader scale. *See Farley*, 11 F.3d at 1389 ("referral memorandum" from FTC to Department of Justice was pre-decisional and deliberative "[h]aving been rendered prior to the Department's decision to bring action against Farley"); *Kennedy*, 2014 WL 4908716 at *4-5 (applying privilege to the redacted portions of several memoranda containing an EEOC investigator's analysis and recommended disposition as to plaintiff's charge of discrimination). The circumstances of this case fall more closely towards

4

the latter group, but certainly squarely within the parameters outlined by all the cases discussed above.

### III.

We turn now to the AVR and the associated documents produced to this Court *in camera*. The nine-page AVR provides the following statement under the page-one heading "Purpose and Scope:"

> Garnet Capital Advisors was retained by the FDIC to perform a market pricing valuation of Midwest Bank and Trust's active loan portfolio. Pricing was based on a combination of spreadsheet data provided by the FDIC and a limited-scope file review at the Bank.

The AVR then describes what Garnet did during the two-day on-site review of Midwest's loan portfolio and includes Garnet's findings and opinions as to, among other things, the state of the financial market at the time of the valuation, Midwest's policies and practices, and the health of Midwest's portfolio. The AVR does not contain any recommendations as to actions FDIC-R should (or should not) take with respect to Midwest.

FDIC-R asserts that the AVR is pre-decisional and deliberative, and that its disclosure would reveal its "confidential analytic model and divulge key aspects of the FDIC Board's decision-making process" (FDIC-R's Mem. at 8). The Declaration of Bret D. Edwards, attached as Exhibit A to FDIC's memorandum, contends that disclosure of the AVR "will necessarily disclose the underlying analytic models and divulge key aspects of the Board's confidential decision-making process" (FDIC-R's Mem., Exh. A., p. 2, ¶ 4). Mr. Edwards states that the AVR "represents opinion and analysis that . . . was created to support FDIC staff recommendations to the FDIC Board regarding the appointment of a receiver for Midwest" (*Id.*). He also states that the AVR is a component of FDIC-R's "least cost test" that FAMB—FDIC's Franchise Asset Marketing Branch—uses it to make decisions and recommendations concerning

the disposition of failed bank assets, and that its disclosure "would improperly reveal internal FDIC decision making" (*Id.* at ¶ 5).

In further support of its position, FDIC-R cites *United Western Bank v. Office of Thrift Supervision*, 853 F. Supp. 2d 12 (D.D.C. 2012). In that case, the FDIC intervened in the proceedings for the limited purpose of arguing that the production of documents by the defendant, who had determined that certain documents were responsive to discovery requests, should be barred under the deliberative process and/or bank examiner's privileges. The documents in question included a memorandum attachment called the "Cost Test Summary," which the court ultimately concluded was protected by the deliberative process privilege. *Id.* at 18-19. FDIC-R suggests that the court's analysis relative to the "Cost Test Summary" should direct us to find similarly here with respect to the AVR (FDIC-R's Mem. at 8).

In reply, rather than address the question of whether the AVR even falls within the deliberative process privilege, Defendants leap forward to the question of whether FDIC-R's interest in confidentiality must yield to their need for the document (Defs.' Reply at 7-10). This approach assumes the applicability of the privilege, and thereby puts the cart before the horse. As we explain below, we find that the AVR constitutes the kind of factual material that, at the threshold, does not trigger the deliberative process privilege. Only then do we further conclude that even if the privilege did apply, Defendants have demonstrated that their interest in having access to the AVR outweighs FDIC-R's interest in confidentiality.

### A.

Numerous reasons support our conclusion that the AVR is not protected by the deliberative process privilege.

*First*, while we agree that the AVR is "predecisional" (as it was generated prior to FDIC-R's decision about how to dispose of Midwest's assets), we find no evidence that the report reflects any of FDIC-R's own deliberations relative to Midwest. Nowhere in the document is there any mention of FDIC-R's deliberations, recommendations or policy determinations that led to its decision as to actions to take as to Midwest. The report contains findings and opinions about Midwest that were generated by the outside consultant, Garnet. But, Garnet's report never refers to FDIC-R personnel or policy, never suggests the creation of a specific policy, and never advises FDIC-R as to how it should proceed relative to Midwest. The factual analysis and opinions were those of Garnet, and nothing in the AVR reveals FDIC-R's deliberative process in deciding what action to take (if any) based on that report.

*Second*, although the AVR states that its valuation was based in part on spreadsheet data provided by FDIC-R, the inclusion of this factual data does not trigger an application of the privilege. The caselaw discussed above indicates that underlying factual data can be deemed "deliberative" if it is "inextricably intertwined" with deliberative communications. *See Saunders v. City of Chicago*, No. 12 C 9158, 2015 WL 4765424, at *10 (N.D. Ill., Aug. 12, 2015). But we are not persuaded that this is the case here. The factual data of the spreadsheet, like the AVR, contains no discussion of any FDIC internal analytic models that may have been used to generate information the FDIC-R disclosed to Garnet. Nothing in the AVR reveals the methodology that generated the spreadsheet numbers that in turn were plugged into the AVR. The Edwards declaration does not explain how disclosure of the AVR, which contains *Garnet's* findings and opinions, will reveal anything about any analytic models FDIC-R employs—much less anything about the FDIC-R's deliberations in reaching its decisions concerning Midwest.

7

*Third*, FDIC-R's cited case, *United Western Bank*, sheds no light on the situation here, as that court's analysis in that case omitted any description of the "Cost Test Summary." There is simply no way to know whether the AVR and the Cost Test Summary share any commonalities, and as such the outcome of *United Western Bank* is not helpful here. In any event, we are not obligated to follow the outcome of a trial court in a different circuit.

*Fourth*, as concerns the proprietary and confidential opinions that FDIC-R claims to exist within this report, the simple assertion of these qualities, without more, is insufficient to carry the agency's burden of proof. *See Stevens v. United States Dep't of Homeland Security*, No. 13 C 03382, 2014 WL 5796429, at *12 (N.D. Ill., Nov. 4, 2014) (rejecting deliberative process privilege where court could not discern how interview notes at issue pertained to any agency policy or were otherwise predecisional or deliberative); *Vaughn v. Rosen*, 523 F.2d 1136, 1147 (D.C. Cir. 1975) (agency's affidavits fail to carry its burden of proof "because at no place do they define, explain, or limit the 'deliberative process' which the Government seeks to protect"). A conclusion in FDIC-R's favor would, when taken to its farthest reaches, promote the protection of every document containing a calculation pertaining to a failed or failing bank potentially under FDIC-R's receivership. We cannot agree that the deliberative process privilege was intended to be interpreted so broadly. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (the privilege should be applied "as narrowly as consistent with efficient Government operation"); *Saunders*, 2015 WL 4765424 at *9 ("If the deliberative process privilege were construed as broadly as the [Cook County State's Attorney's Office] suggests, a cloak would be placed over *all* factual information developed during a reinvestigation").

## B.

Furthermore, the deliberative process privilege, even when applicable, is not absolute. It may be overcome when the party seeking the production of a document shows that its need for the documents at issue outweighs the government's interest in confidentiality. *Farley,* 11 F.3d at 1389–90. Here, even if we were to conclude that the AVR falls within the deliberative process privilege, we would nevertheless find that the Defendants' interest in the document outweighs FDIC-R's need for confidentiality. We arrive at this determination by taking into consideration five important factors: (1) the relevance of the document to the litigation; (2) the availability of other evidence; (3) the government's role in the litigation; (4) the seriousness of the litigation; and (5) the extent to which disclosure would chill future deliberations. *Saunders,* 2015 WL 4765424, at *9; *K.L. v. Edgar,* 964 F. Supp. at 1209. We address each factor in turn.

Relevance. Defendants argue that the AVR constitutes relevant—and, indeed, very important—evidence as to the quality and performance of Midwest's loan portfolio, including the six target loans. Defendants maintain that FDIC-R's damages theory is based on Midwest's pre-closing write-down of loans, and the estimates made on the AVR are relevant to evaluating and comparing these estimates (Defs.' Mot. at 5-8). Further, Defendants argue that the AVR is relevant to issues of damages and loss causation, their business judgment rule defense, and the effect of unforeseeable market changes on the banking industry (*Id.*). FDIC-R contends, on the other hand, that the AVR is irrelevant to the suit because it was neither used by Defendants to approve the six target loans nor by the FDIC-R in computing damages: "A modeled estimated snapshot valuation of all of the Bank's assets in 2010, made to assist the FDIC in its resolutions procedures, is simply not pertinent to the actual pre-receivership charge-offs or the actual gains or losses sustained post-receivership" (FDIC-R's Mem. at 5). In other words, FDIC-R maintains

that its valuation of Midwest's entire portfolio has no bearing on Defendants' specific acts or omissions.

Based on our *in camera* review, we agree with Defendants that the AVR is relevant to FDIC-R's allegations. The AVR valued Midwest's portfolio and assessed the bank's practices just one month before the bank was shut down and FDIC-R was appointed receiver. The AVR contains information that any defendant under these circumstances would want to see, and should be able to see. While FDIC-R says that the AVR contains only "sampling-based estimates of a range of possible market values in the Spring of 2010" (FDIC-R's Mem. at 2), we find that Defendants are entitled to know these estimates to allow them to test whatever calculations FDIC-R may choose to offer in this case. Defendants are also entitled to evidence that could bear on (a) FDIC-R's decision to enter into the agreement with FirstMerit; (b) the terms FDIC-R and FirstMerit struck; and (c) FDIC-R's claims of negligence, gross negligence, and breach of fiduciary duty arising out of Midwest's handling of the six target loans. While we are unable to discern from the AVR whether information contained therein relates specifically to the target loans, we cannot exclude the possibility that Defendants, who authorized the loans, will be able to glean highly relevant information from these documents.

<u>Availability of Other Evidence</u>. Defendants maintain that the AVR is the only independent valuation of the Bank's loan portfolio, and the only valuation performed at or around the time of Midwest's closing, and as such the AVR is the only evidence of its kind (Defs.' Reply at 7). FDIC-R asserts that Defendants have received substantial amounts of evidence regarding damages, as "FDIC-R has produced hundreds of documents showing both the pre-failure write-downs that Defendants authorized for the loans identified in the Complaint, as well as the post-failure losses incurred by FirstMerit Bank pursuant to the FDIC-R's loss-sharing

10

agreement" (FDIC-R's Mem. at 9). Again, we agree with Defendants. The Court has not been made aware of other documents, like the AVR, that show the bank's valuation and analysis of its practices at the time it was placed into receivership. The mere fact that FDIC-R has produced hundreds or even thousands of documents to date has no bearing upon whether it has produced other evidence reflective of damages that essentially takes the place of the AVR.

Seriousness of the Litigation. Defendants argue that the litigation is serious as it involves tens of millions in alleged damages (Defs.' Mot. at 10). FDIC-R does not speak to this point. We agree with Defendants that the nature of the claims raised in the lawsuit and the amount of damages sought indicate that this litigation is serious. This factor weighs in favor of disclosure.

Role of the Government. Defendants point out that the role of the government in this case is crucial as "the government is the plaintiff and has a direct interest in the outcome of the lawsuit" (Defs.' Mot. at 10). Again, FDIC-R does not address this point. We agree with Defendants that the government has a considerable role in this litigation and, accordingly, this factor also weighs in favor of disclosure. We agree with the observation in *In re Franklin Nat. Bank Securities Litigation*, 478 F. Supp. 577, 587 (D.C.N.Y. 1979), that "an element of unfairness would enter if the government could further its defense against these claims by concealing relevant evidence behind the screen of government privilege." That observation applies here, as well, where FDIC-R is advancing rather than defending claims.

Chilling Effect. Defendants maintain that production of the AVR would not have a chilling effect on FDIC-R because Midwest has been closed for five years. Defendants also point out that the effects of disclosure can be mitigated by a protective order aimed at guarding the document's confidentiality (Defs.' Mot. at 11). FDIC-R maintains that the AVR is highly sensitive, and that its disclosure would have a chilling effect on full and frank deliberations and

would negatively impact future deliberative processes and failed bank resolutions (FDIC-R Mem. at 10). We find that FDIC-R overstates the consequences of disclosure. The fact of disclosure in this case does not necessarily translate into future disclosures, as each case involves a fresh consideration of the facts at issue and the factors militating for or against the application of privilege. FDIC-R does not explain how the disclosure of the AVR would stymie the candor of FDIC staff deliberations in the future. We therefore agree with Defendants that the likelihood of a chilling effect upon future deliberations does not weigh against Defendants' right to access the AVR.

In sum, when looking at the factors to be weighed when considering a party's need for access to a document notwithstanding the protective cloak of the deliberative process privilege, we find that these factors weigh in Defendants' favor and further support our decision to order production of the AVR.

## **CONCLUSION**

For the reasons set forth above, the Court grants Defendants' Motion to Compel Production of Document and Deposition Testimony (doc. # 111). We order FDIC-R to produce the AVR by October 5, 2015 and to produce a Rule 30(b)(6) witness to testify about this document on or before October 30, 2015.

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

**Dated: September 18, 2015**